UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VERSATILE HOUSEWARES &
GARDENING SYSTEMS, INC.,

                    Plaintiff,

v.                                                      Civil Action No.

THILL LOGISTICS, INC.;
SAS GROUP, INC.;
NAT, LLC; and
JORDAN DREW CORPORATION,

                    Defendants.

---

## COMPLAINT

---

Plaintiff Versatile Housewares & Gardening Systems, Inc., ("Versatile") by its attorneys,

for its complaint against defendants Thill Logistics, Inc. ("Thill"), SAS Group, Inc. ("SAS"),

NAT, LLC ("NAT") and Jordan Drew Corporation ("Jordan Drew") alleges:

### NATURE OF ACTION

1.      This is an action for violations of Section 43 of the Lanham Act, Title 15 United

States Code, The Copyright Act, 17 U.S.C. § 101, et seq., Wis. Stat. § 132, et seq. and 100, et

seq., common law trademark infringement and breach of contract.

2.      SAS sells a gardening tool product that infringes Versatile's rights in its

AWESOME AUGER products, for example its trademark and copyrighted instructions and

photos.  NAT and Thill, which are related corporate entities, import SAS's infringing gardening

tool products from China and into this District.  NAT and Thill then fulfill orders for SAS by

shipping the infringing gardening tool products and accepting payment from customers.

{00272425.DOC /}

## PARTIES

3.     Versatile is a Wisconsin company located at 100 Dahlen Circle, Cambridge, Wisconsin.

4.     SAS is a New York company with its principle place of business at 200 White Plains Road, Tarrytown, New York.

5.     Thill is a Wisconsin company with its principal place of business at 355 Byrd Avenue, Neenah, Wisconsin.  Upon information and belief, Thill imports an infringing AWESOME AUGER gardening tool into this District for SAS, distributes the AWESOME AUGER gardening tool to customers who have ordered the AWESOME AUGER tool from SAS, accepts payment for the gardening tools from SAS's customers, and stores AWESOME AUGER gardening tools at one of its warehouses in this District for SAS.

6.      NAT is a Wisconsin company with its principal place of business at 355 Byrd Avenue, Neenah, Wisconsin.  Upon information and belief, NAT and Thill are related companies.  It is believed that NAT is a parent company of Thill, and therefore Thill's activities relating to the infringing gardening tools and packaging are directly attributable to NAT.

7.     Jordan Drew is a New York company with its principal place of business at 28 Northdale Avenue, White Plains, New York.  Upon information and belief, Jordan Drew and SAS are related companies.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

9.     This Court has both general and specific jurisdiction over Thill and NAT.  Both Thill and NAT have their respective principal places of businesses located in this District.

Moreover, Thill and NAT import SAS's infringing gardening tools and packaging, which are a basis for this lawsuit, into this District and then distribute the infringing products to SAS's customers throughout the country.

10.     This Court has both general and specific jurisdiction over SAS.  This Court has general jurisdiction over SAS because SAS has engaged in pervasive and intentional business contacts in this District, including (1) conducting business with Thill and NAT relating to the importation and distribution of the infringing gardening tools and packaging, and (2) entering into a distribution and royalty agreement with Versatile, a Wisconsin company.  Moreover, upon information and belief, SAS sells the infringing gardening tools and packaging, as well as other of SAS's products, to customers in this District.  This Court has specific jurisdiction over SAS because SAS has intentionally established contacts within this District by engaging Thill and NAT for the importation and distribution of SAS's infringing gardening tools and packaging, and by entering into a distribution and royalty agreement with Versatile, which are bases for this lawsuit.  Moreover, upon information and belief, SAS intentionally targets consumers in this District via marketing and advertising, including television commercials featuring the infringing products.

11.     This Court has general and specific jurisdiction over Jordan Drew.  Upon information and belief, Jordan Drew and SAS are related companies.  Jordan Drew has claimed trademark rights in Versatile's AWESOME AUGER trademark by virtue of SAS's use of the mark on SAS's infringing gardening tools and packaging, which are imported into, stored in and distributed from this District.  Indeed, Jordan Drew submitted the packaging for SAS's gardening tool to the U.S. Patent & Trademark Office as a specimen of trademark use.  Thus, for the purpose of claiming trademark rights before the U.S. Patent & Trademark Office, Jordan

Drew has adopted SAS's actions with respect to the infringing gardening tools and packaging as its own. Accordingly, SAS's actions relating to the infringing products detailed above are directly attributable to Jordan Drew, and this Court has general and specific jurisdiction over Jordan Drew for the same reasons as it does over SAS.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391. As detailed above, upon information and belief, a majority of SAS's infringing gardening tools and packaging, if not all of them, are imported into, stored in, and distributed from Thill's and NAT's facilities in this District. Both Thill and NAT have principal places of business in this District and therefore reside in this District. SAS and Jordan Drew reside in this District by virtue of their contacts within this District, including their business dealings with Thill and NAT.

**FACTS RELATING TO VERSATILE'S RELATIONSHIP WITH SAS**

13.     Around 2001 Versatile, completed development of a gardening tool and began selling it under the trademark AWESOME AUGER. Thomas Motosko, Versatile's principal, invented the tool primarily to help disabled people, like himself, more fully enjoy gardening.

14.     In September 2002, Versatile filed a patent application directed to its tool. U.S. Patent 6,955,227 ("the '227 patent") issued from that application on October 18, 2005.

15.     In November 2006, Versatile and SAS began negotiations regarding a potential distribution and royalty agreement regarding Versatile's AWESOME AUGER gardening tool.

16.     When Versatile first engaged SAS regarding a potential agreement, Versatile's AWESOME AUGER tool was a fully developed, market-tested product. In other words, SAS was able to hit the ground running with respect to marketing, advertising and selling the AWESOME AUGER product.

17.     On December 22, 2006, Versatile and SAS finalized and executed the Worldwide Distribution and Royalty Agreement ("the Agreement"). A copy of the Agreement is attached hereto as Exhibit A.

18.     Generally speaking, the Agreement assigned the '227 patent to SAS and required SAS to make royalty payments to Versatile for sales of gardening tools sold under the '227 patent. The Agreement also provided for a reverse royalty whereby Versatile paid a royalty to SAS for any sales of gardening tools sold under the '227 patent.

19.     During negotiations pertaining to the Agreement, Versatile proposed to explicitly include the AWESOME AUGER trademark in the Agreement. However, SAS initially rejected this proposal and informed Versatile that SAS would sell Versatile's gardening tool under a different trademark. *See* Scott Sobo email dated December 4, 2006, attached hereto as Exhibit B.

20.     But, contrary to its statements during negotiations with Versatile, SAS did not coin its own trademark for Versatile's gardening tool. Rather than re-brand the gardening tool, SAS decided to use Versatile's AWESOME AUGER mark, which Versatile had been using in the market place for more than five years. SAS also decided to use Versatile's copyrighted photographs and instructions in connection with the sale of SAS's gardening tool.

21.     The license of Versatile's AWESOME AUGER mark and copyrighted works to SAS arose after the December 22 Agreement. The Agreement was not formally amended to reflect the licensing of Versatile's AWESOME AUGER mark and copyrighted works to SAS.

22.     Instead, Versatile considered SAS's royalty payments under the Agreement to encompass SAS's use of the AWESOME AUGER mark and copyrighted instructions and photos. As mentioned above, Versatile brought SAS a product that was fully developed, that

was protected by a patent, and that had been sold under the AWESOME AUGER mark for more than five years.  Versatile also provided its copyrighted instructions and photos to SAS.  In Versatile's opinion, SAS's royalty payments were sufficient consideration for use of all of Versatile's intellectual property.

23.     SAS recognized that it had licensed more than the '227 patent.  For example, in an email from Versatile to SAS dated July 18, 2007, Versatile noted that "I licensed the patent and trademarks to you for 17 more months so Ground Aug and Awesome Auger is yours for now."  A copy of the email is attached hereto as Exhibit C.  In response to that email, SAS acknowledged that "you [Versatile] own the trademark."  *See* Exhibit C.

24.     After entering into the Agreement, SAS sold a gardening tool under the AWESOME AUGER mark and used Versatile's copyrighted works.  SAS paid royalties to Versatile, and Versatile monitored SAS's use of the AWESOME AUGER mark.  Examples of Versatile's quality control over SAS's use of the AWESOME AUGER mark include the Agreement, which specified a gardening tool "sold under" the '227 patent (which defined technical specifications for the gardening tool), SAS's use of Versatile's approved Chinese manufacturer to make the gardening tools, and Versatile's assistance in developing the packaging, promotional video, and AWESOME AUGER logo used in connection with SAS's gardening tool product.

25.     At some point during the course of the Agreement, SAS significantly changed the design of the gardening tool from that which Versatile initially presented to SAS.  The original AWESOME AUGER gardening tool that Versatile presented to SAS had a 14" shaft and a 26" extension shaft.  When connected together, the gardening tool had a shaft that was 40" long.

Accordingly, most adults can use Versatile's gardening tool while standing up, which is illustrated in a photo on the packaging for SAS's product.

26.     SAS changed the design such that the length of the SAS gardening tool plus the extension shaft is only about 22". At this length, most adults cannot use SAS's gardening tool standing up. SAS continued to use photos of the 40" shaft gardening tool in its advertisements, including television commercials and on the product packaging (despite the fact that the gardening tool shown on the box was not what was inside the SAS box after SAS's design change). This is a classic bait-and-switch operation.

27.     SAS changed the design of the gardening tool to one having a shorter shaft so that the gardening tool could be packaged in a smaller box, which in turn reduced the shipping costs per box from China. In other words, SAS began selling an inferior product in order to increase its profit margin.

28.     After SAS had implemented this design change, Versatile began to receive customer complaints relating to the gardening tool being sold by SAS. SAS was compromising the long-established goodwill in Versatile's AWESOME AUGER mark by selling an inferior product in order to make some extra money, and the consuming public was reacting negatively. In short, the consuming public is being ripped off by SAS, and they are complaining to Versatile about it. Versatile notified SAS of the complaints.

29.     In June 2008, SAS abruptly stopped making royalty payments to Versatile. The last payment Versatile received was for SAS's June 2008 sales of the AWESOME AUGER gardening tool.

30.     On June 9, 2008, which is about the same time that SAS stopped making royalty payments to Versatile, SAS's attorney Kevin Harrington ("Harrington") filed a U.S. trademark

application for the AWESOME AUGER mark on behalf of Jordan Drew, which issued as U.S.
Trademark Reg. No. 3,546,843. Harrington filed this application knowing full well that
Versatile was the owner of the mark, and that Versatile had been using the mark in commerce
prior to SAS. Harrington knew this because at least as early as November 2006 he was involved
in the negotiations leading to the December 2006 Agreement, which is when Versatile first
introduced the AWESOME AUGER mark to SAS. *See, e.g.*, Exhibit B. Despite this knowledge,
Harrington made false and misleading statements to the Patent and Trademark Office regarding
the ownership of and rights in the AWESOME AUGER mark.

      31.    Still further, on September 29, 2008, Harrington filed applications on behalf of
Jordan Drew for the terms "ULTIMATE AWESOME AUGER" and "ULTIMATE AUGER,"
which also belong to Versatile. The ULTIMATE AWESOME AUGER mark is a simple
variation of Versatile's AWESOME AUGER mark, and SAS has no rights in either of those
marks. The ULTIMATE AUGER mark is the mark that Versatile is using to describe its next
generation gardening tool product, a mark that Versatile introduced to SAS. SAS's attempt to
register these marks is just another example of SAS's underhanded attempt to derail Versatile's
development and sales of its gardening tool products.

      32.    Due to SAS's failure to make royalty payments, the Agreement terminated on
January 1, 2009. Specifically, paragraph 1.2 states that the Agreement will have "automatic 2
year renewals for so long as Distributor [SAS] shall comply with all of its obligations under this
Agreement."

      33.    On several occasions, Versatile asked SAS to pay the royalties owed, but SAS did
not make any further payments. For example, On July 16, 2009, Versatile, via a letter from its

counsel, notified SAS of its failure to make royalty payments and provided fifteen (15) days to cure pursuant to paragraph 4.1 of the Agreement.

34.  On August 4, 2009, SAS, via a letter from its counsel, responded that it would not pay the royalties owed to Versatile.

35.  On August 12, 2009, Versatile, via a letter from its counsel, memorialized the termination of the Agreement.  Versatile further demanded payment of all royalties owed and that SAS stop using Versatile's AWESOME AUGER mark and copyrighted works in conjunction with SAS's sales of the gardening tool.

36.  On August 18, 2009, SAS, via a letter from its counsel, again stated that SAS would not pay the royalties owed.  SAS also did not confirm that it would stop using Versatile's AWESOME AUGER mark and copyrighted works.

37.  After attempts to speak with SAS's counsel failed, Versatile filed this complaint.

38.  SAS is continuing to use Versatile's AWESOME AUGER mark and copyrighted works without Versatile's permission.  SAS's continued use of Versatile's trademark and copyrighted works in advertising its gardening tool is causing injury to Versatile.

39.  Upon information, SAS's continued use of Versatile's AWESOME AUGER mark and copyrighted works constitutes willful infringement.

40.  As a result of the infringement by SAS, Versatile is entitled to recover any profits made by SAS, any damages sustained by Versatile, and costs of this action.

41.  Unless enjoined, use of Versatile's AWESOME AUGER mark and copyrighted works by SAS will continue to cause irreparable harm to Versatile.

## FACTS RELATING TO VERSATILE'S AWESOME AUGER MARK

42.     Versatile has been using its AWESOME AUGER mark since at least as early as 2001 in connection with sales of Versatile's gardening tool.

43.     Since 2001, Versatile has consistently and continuously used, and continues to use, its AWESOME AUGER mark in interstate commerce in connection with its sales of gardening tools.

44.     By virtue of its consistent and continuous use of the AWESOME AUGER mark since 2001, Versatile has established nationwide trademark rights in the AWESOME AUGER mark.

45.     Versatile's AWESOME AUGER mark is inherently distinctive.

46.     In the alternative, Versatile's AWESOME AUGER mark has acquired distinctiveness by virtue of Versatile's consistent and continuous use of the mark in connection with Versatile's gardening tools since 2001.

47.     On August 6, 2003, the Office of the Secretary of State of the State of Wisconsin issued a Wisconsin state trademark registration to Versatile for its AWESOME AUGER mark. A copy of the registration is attached hereto as Exhibit D.

## COUNT I – TRADEMARK INFRINGEMENT
### (Against SAS, Thill and NAT)
### Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125

48.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-47 as if fully set forth herein.

49.     Upon information and belief, SAS's, Thill's and NAT's unauthorized use of the AWESOME AUGER mark is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of SAS and Thill with Versatile.

50.     Upon information and belief, SAS's, Thill's and NAT's unauthorized use of the AWESOME AUGER mark is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of SAS's, Thill's and NAT's goods, services, or commercial activities by Versatile.

51.     Unauthorized use by SAS, Thill and NAT of the AWESOME AUGER mark is a violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.

52.     Importation by Thill and NAT of gardening tools bearing the AWESOME AUGER mark is a violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.

53.     Pursuant to 15 U.S.C. § 1116, Versatile is entitled to a preliminary and a permanent injunction against further infringement.

54.     Pursuant to 15 U.S.C. § 1117, Versatile is entitled to SAS's, Thill's and NAT's profits, any damages suffered by Versatile, and the costs of this action.

## COUNT II – TRADEMARK INFRINGEMENT
### (Against SAS, Thill and NAT)
### Violation Wisconsin Statute 132, et seq.

55.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-54 as if fully set forth herein.

56.     SAS's, Thill's and NAT's unauthorized use of Versatile's AWESOME AUGER mark is a violation of Wis. Stat. § 132.02.

57.     Versatile has been irreparably harmed by SAS's, Thill's and NAT's use of the AWESOME AUGER mark.

58.     Versatile is entitled to damages of $10,000 pursuant to Wis. Stat. § 132.03.

59.     Versatile is entitled to injunctive relief pursuant to Wis. Stat. § 132.033 enjoining SAS, Thill and NAT from using the AWESOME AUGER mark.

60.     Versatile is entitled to recover damages and costs of this lawsuit (including attorneys fees) pursuant to Wis. Stat. § 132.033(2)(b)-(d).

## COUNT III – WISCONSIN COMMON LAW TRADEMARK INFRINGEMENT
### (Against SAS, Thill and NAT)

61.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-60 as if fully set forth herein.

62.     Unauthorized use by SAS, Thill and NAT of the AWESOME AUGER mark constitutes common law trademark infringement.

## COUNT IV – CONTRIBUTORY TRADEMARK INFRINGEMENT
### (Against Thill and NAT)

63.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-62 as if fully set forth herein.

64.     Upon information and belief, Thill and NAT, have contributed and continue to contribute to SAS's impermissible use of the AWESOME AUGER mark by distributing SAS's infringing products throughout Wisconsin and the United States.

65.     Thill's and NAT's actions amount to contributory trademark infringement of Versatile's AWESOME AUGER mark.

## COUNT V – FRAUDULENT REPRESENTATIONS

### (Against SAS only)

### Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125

66.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-65 as if fully set forth herein.

67.     SAS's impermissible use of Versatile's AWESOME AUGER mark is deceptive or misleading to the consuming public.  For example, the consuming public is likely to believe that SAS's gardening tool, which is inferior to Versatile's gardening tool, is associated with Versatile.

68.     In another example, SAS uses a photograph of Versatile's gardening tool, which has shaft and extension that together are 40" in length, on the packaging for SAS's gardening tool.  This is deceptive and misleading because SAS's gardening tool has a shaft and extension that are only 22" in length.  In other words, the product displayed on SAS's box (i.e., Versatile's gardening tool) is not the product that is actually inside the SAS box.

69.     SAS is intentionally using Versatile's AWESOME AUGER mark and a photograph of Versatile's gardening tool to sell SAS's inferior gardening tools.

70.     SAS's deceptive and misleading practices constitute a violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.

71.     Pursuant to 15 U.S.C. § 1117, Versatile is entitled to SAS's profits, any damages suffered by Versatile, and the costs of this action.

## COUNT VI – FRAUDULENT REPRESENTATIONS
### (Against SAS only)
### Violation of Wis. Stat. § 100.18

72.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-71 as if fully set forth herein.

73.     Versatile has suffered pecuniary loss on account of SAS's actions relating to SAS's unauthorized use of Versatile's AWESOME AUGER mark and as a result of SAS's use of deceptive and misleading advertising, e.g., using Versatile's 40" gardening tool in advertising to sell SAS's 26" gardening tool.

74.     Versatile is entitled to an award of damages and attorney fees pursuant to Wis. Stat. § 100.18(11)(b)2.

## COUNT VII – COPYRIGHT INFRINGEMENT
### (Against SAS, Thill and NAT)
### Violation of 17 U.S.C. § 101, et. seq.

75.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-74 as if fully set forth herein.

76.     Versatile owns U.S. copyright registration no. TX0006411738 which is directed to an instruction sheet for a gardening tool.  A copy of the registration, which issued May 5, 2006, is attached hereto as Exhibit E.

77.     On July 24, 2009, Versatile filed an application with the U.S. Copyright Office for registration of a promotional video for Versatile's gardening tool.  Versatile owns the copyright in the video.

78.     On September 2, 2009, Versatile filed an application with the U.S. Copyright Office for registration of still photos taken from the promotional video for Versatile's gardening tool.  Versatile owns the copyright in the photos.

79.     SAS, Thill and NAT have infringed Versatile's copyrights in the instructions and the video by the unauthorized copying the copyrighted works or creating derivative works and incorporating them into the instructions and packaging for SAS's gardening tool.

80.     SAS has had access to Versatile's copyrighted works because Versatile provided the copyrighted works to SAS, and SAS continues to use substantially similar instructions and photos which were derived from Versatile's originals.

81.     SAS continues to infringe Versatile's copyrights by continuing to sell gardening tools using the infringing instructions and packaging.  SAS's unauthorized copying, reproduction, sale and distribution of Versatile's copyrighted works constitutes infringement of Versatile's copyrights.

82.     As a result of the infringement, Versatile is entitled to recover its actual damages, and any profits of SAS, Thill and NAT that are attributable to the infringement.

83.     Pursuant to 17 U.S.C. § 504(c), Versatile is entitled to enhanced damages for the willful infringement of its copyrights.

84.     Pursuant to 17 U.S.C. § 502, Versatile is entitled to a preliminary and permanent injunction against further infringement.

85.     Versatile is entitled to an award of its attorney's fees for infringement of a registered work under 17 U.S.C. § 505.

## COUNT VIII – CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (Against Thill and NAT)

86.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-85 as if fully set forth herein.

87.     Upon information and belief, Thill and NAT, have contributed and continue to contribute to SAS's impermissible use of Versatile's copyrighted works.

88.     Thill's and NAT's actions amount to contributory copyright infringement.

## COUNT IX – FRAUDULENT TRADEMARK REGISTRATION
### (Against Jordan Drew only)
### Cancellation of Jordan Drew's U.S. Trademark Registration for AWESOME AUGER pursuant to 15 U.S.C. § 1092

89.     Versatile realleges and incorporates by reference the allegations in paragraphs 1-88 as if fully set forth herein.

90.     On June 9, 2008, SAS's counsel Kevin Harrington ("Harrington") filed on behalf of Jordan Drew a trademark application for the AWESOME AUGER mark with the U.S. Patent and Trademark Office.

91.     On June 9, 2008, Harrington declared to the U.S. Patent and Trademark Office that "he/she believes the applicant [Jordan Drew] to be the owner of the trademark/service mark sought to be registered."

92.     On June 9, 2008, Harrington declared to the U.S. Patent and Trademark Office that "to the best of his/her knowledge and belief no other person, firm corporation or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive."

93.    Beginning in at least as early as November 2006, Harrington was involved with negotiations leading to the Agreement between Versatile and SAS, and he was made aware of Versatile's AWESOME AUGER mark during those negotiations.

94.    Harington's client, SAS, was aware of Versatile's ownership of the AWESOME AUGER mark and admitted so in an email to Versatile dated July 17, 2007.  *See* Exhibit C.

95.    Upon information and belief, when the registration was filed on June 9, 2008, Harrington knew that Versatile was the owner of the AWESOME AUGER mark and that Versatile had the right to use the AWESOME AUGER mark in commerce.  *See, e.g.*, Exhibit B. Versatile never transferred any ownership rights in the AWESOME AUGER mark to SAS or Jordan Drew.

96.    Upon information and belief, Harrington knew his representation regarding Jordan Drew's ownership of the AWESOME AUGER mark was false, or at least misleading.

97.    Upon information and belief, Harrington knew his representation regarding others', namely Versatile's, right to use the mark was false, or at least misleading.

98.    Upon information and belief, Harrington intended to induce the U.S. Patent and Trademark Office into allowing a registration for the AWESOME AUGER mark.

99.    Upon information and belief, the U.S. Patent and Trademark Office relied upon Harrington's declarations in allowing registration for the AWESOME AUGER mark.

100.    Versatile has been and continues to be damaged by the continued maintenance of Jordan Drew's fraudulently obtained registration for the AWESOME AUGER mark.

101.    Jordan Drew's Registration No. 3,546,843 for "AWESOME AUGER" is invalid because it was fraudulently obtained and is subject to cancellation by this Court pursuant to 15 U.S.C. §§ 1092 and 1119.

## COUNT X – BREACH OF CONTRACT

### (Against SAS only)

102.    Versatile realleges and incorporates by reference the allegations in paragraphs 1-101 as if fully set forth herein.

103.    SAS's failure to pay royalties to Versatile to for use of Versatile's AWESOME AUGER mark and copyrighted works constitutes a material breach of contract.

104.    Versatile has performed its contractual obligations to SAS.

105.    As a result of SAS's breach, Versatile has suffered monetary damages plus consequential and incidental damages, the precise amount of which to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, plaintiff Versatile Housewares & Gardening Systems, Inc., demands that judgment be entered in its favor and against defendants SAS, Thill, NAT and Jordan Drew as follows:

A.    Adjudging that SAS, Thill and NAT have infringed Versatile's AWESOME AUGER mark;

B.    Adjudging that SAS, Thill and NAT have infringed Versatile's copyrighted works;

C.    Adjudging that SAS, Thill and NAT have made fraudulent representations in violation of the Lanham Act and Wisconsin law;

D.    Temporarily and permanently enjoining defendants and those in privity with them from using the AWESOME AUGER mark and from using Versatile's copyrighted works;

E.    Awarding Versatile its damages together with prejudgment interest, caused by defendants' use of the AWESOME AUGER mark and copyrighted works, including, but not limited to, Versatile's actual damages and all revenues and profits made by defendants as a result of the infringement;

F.    Cancelling Jordan Drew's U.S. Trademark Registration No. 3,546,843 for "AWESOME AUGER;"

G.      Adjudging that SAS has breached its contract with Versatile;

H.      Ordering SAS to assign the '227 patent to Versatile;

I.      Awarding Versatile the reasonable attorneys' fees and costs of this action; and

J.      Granting such other and further relief as the court deems appropriate.

### JURY DEMAND

Plaintiff Versatile Housewares & Gardening Systems, Inc. demands a jury for all factual

issues not admitted by the defendant.

Dated: September 3, 2009

Michael J. Gratz
Michael T. Griggs
BOYLE FREDRICKSON S.C.
840 N. Plankinton Ave.
Milwaukee, WI  53203
Telephone:  414-225-9755
Facsimile:  414-225-9753

*Attorneys for Plaintiff Versatile Housewares &*
*Gardening Systems, Inc.*

# WORLDWIDE DISTRIBUTION AND ROYALTY AGREEMENT

This WORLDWIDE DISTRIBUTION AND ROYALTY AGREEMENT ("Agreement") is dated as of the 19th day of December, 2006, between **SAS Group, Inc.**, a New York corporation, with its principal office located at 200 White Plains Road, Tarrytown, New York 10591 ("Distributor" or "SAS") and **Versatile Housewares and Gardening Systems, Inc.**, a Wisconson corporation, with its principal office located at 100 Dahlen Circle, Cambridge, Wisconson ("Owner").

WHEREAS Owner is the owner of a patent issued by the United States Patent and Trademark office, patent number 6,955,227(the "Patent")

WHEREAS, Distributor desires to arrange for the manufacture of, market, advertise, distribute and sell products, including a ground auger, under the Patent (the "Product") throughout the world at Distributor's own expense under the provisions set forth below;

WHEREAS, as set forth below, Distributor shall pay a royalty to Owner on all sales of the Product throughout the world;

WHEREAS, for so long as this Agreement shall remain in effect, the ownership of the Marks and the Patent shall be assigned to Distributor as set forth below;

WHEREAS, Owner and Distributor desire to enter into and make their respective covenants and agreements provided herein and to otherwise consummate the transactions provided for in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

## GRANT OF CERTAIN DISTRIBUTION RIGHTS TO PRODUCT

1. **Grant of Distribution Rights for the Product**

    **1.1    Rights Granted to Licensee:**

    Under the terms set out in this agreement, Owner hereby grants to Distributor the exclusive rights to manufacture, source, advertise, promote, market, sell and otherwise distribute the Product throughout the Territory (defined below) at Distributor's own expense:

EXHIBIT

A

**1.2    Term:**

The term of this Agreement shall be for 2 years ("Initial Term") commencing January 1, 2007 with automatic 2 year renewals for so long as Distributor shall comply with all of its obligations under this Agreement ("Renewal Terms").

**1.3    Territory:**

Owner grants to Distributor the exclusive rights to manufacture, source, advertise, promote, market, sell and otherwise distribute the Product throughout the World (the "Territory").  The Patent is a U.S. patent, but Distributor shall exercise the right to advertise, promote, market and sell and otherwise distribute the Product throughout the Territory, at Distributor's discretion.  Distributor agrees to pay a royalty to Owner on all sales throughout the Territory, notwithstanding the fact that the Patent is limited geographically to the United States.

## PURCHASE OF THE PRODUCT

**2.1**    Distributor shall purchase the Product at its sole cost and expense.  Distributor may consult with Owner concerning any issues which may arise or to request recommendations from Owner involving the sourcing of the Product; however Distributor shall have final responsibility and control over sourcing and purchasing of the Product.  Under no circumstances shall Owner have any financial responsibility for the costs of purchasing or marketing the Product.

## ROYALTIES AND REPORTING

**3.1**    Distributor shall pay a royalty on all Net Sales Collected of the Product throughout the Territory.  "Net Sales Collected" shall be revenue received from all sales of the Product for which payment is made by a customer of SAS, less chargebacks for returns and all costs associated with returns, including bad debt, freight and handling charges; and less merchandise or other promotional credits agreed to by Distributor or imposed by a customer of Distributor concerning sales of the Product.

**3.2**    Royalties in Different Trade Channels

**a)**    Distributor shall pay a Royalty of 5% on Net Sales Collected for the Product (the "Retail Royalty") sold wholesale to a Retailer, as defined below.  As used herein, the term "Retailer" shall include retail store chains, retail stores, on-line retailers, mail order retailers or transactional retailers such as QVC or HSN.

**b)**    For units sold directly to consumers via any form of direct response television ("Direct Response Sales"), SAS Group shall pay Owner 3% of Net Sales Collected ("Direct Response Royalty").

**3.3**    For so long as this Agreement shall remain in effect, each calendar quarter Distributor shall prepare and forward to Owner a royalty report calculating Net Sales Collected and calculating the Retail Royalty and the Direct Response Royalty owed to Owner ("Royalty Report").  The Royalty Report shall be due within 30 days of the end of each calendar quarter.  Hence, the report for the first calendar quarter of 2007 shall be due on April 30, 2007 and henceforth at quarterly intervals thereafter.

**3.4**    Payment of the Royalty owed for each calendar quarter shall me made at the same time as the Royalty Report as set forth in paragraph 3.3 above.

**3.5**    Distributor agrees to payment of minimum annual royalties of $30,000.00 per year based upon payments for four calendar quarters under the payment terms and timing of payments set forth above.  If the royalties accrued for any calendar year do not exceed $30,000.00, (Thirty Thousand Dollars) Owner may terminate this Agreement upon thirty days written notice to SAS Group, unless SAS Group pays Owner the difference between $30,000.00 and the royalties accrued during the calendar year; in which case SAS Group shall retain the rights to the Product for the following twelve (12) month period.

**TERMINATION**

**4.1**    In the event SAS shall fail to make any payment of Royalty as required hereunder, Owner may send a written notice of such failure pursuant to the notice provisions of this Agreement ("Default Notice").  SAS shall have 15 days to cure such failure ("Cure Period").  In the event of a failure to cure a payment default within the Cure Period, this Agreement may be terminated by a notice of termination ("Notice of Termination") which shall be effective 30 days after such notice is given.

**4.2**    Upon request not more than once per calendar year, Owner may request to see the business records of Distributor concerning Net Sales Collected for the preceding one year period. Distributor shall provide access for Owner to examine such records upon reasonable notice, but no later than 30 days after such request.  In the event that Distributor shall fail to provide access to such records as required under this Section, Owner may send a written notice of such failure pursuant to the notice provisions of this Agreement ("Default Notice").  SAS shall have 15 days to cure such failure ("Cure Period").  In the event of a failure to cure such a default within the Cure Period, this Agreement may be terminated by a notice of termination ("Notice of Termination") which shall be effective 30 days after such notice is given.

**SALES OF THE PRODUCT BY OWNER**

**5.1**    Nothing contained herein shall prevent Owner from selling the Product to consumers at pitch fairs, provided all pitch fairs at which the Product is sold are from the list of pitch fairs annexed hereto as Exhibit A.  Owner shall not sell the Product at pitch fairs in wholesale quantities and shall not sell the product at pitch fairs to companies or individuals who may become distributors or may attempt to become distributors of the Product.

**5.2**    Owner shall pay a royalty to Distributor of 5% of Net Sales Collected for all sales which Owner makes at pitch fairs.

**5.3**    For so long as this Agreement shall remain in effect, each calendar quarter in which Owner shall sell the Product at pitch fairs, Owner shall prepare and forward to Distributor a royalty report calculating Net Sales Collected and calculating the royalty owed to Distributor ("Royalty Report"). The Royalty Report shall be due within 30 days of the end of each calendar quarter. Hence, the report for the first calendar quarter of 2007 shall be due on April 30, 2007 and henceforth at quarterly intervals thereafter.

**5.4**    Payment of the Royalty owed by Owner to Distributor for each calendar quarter shall me made at the same time as the Royalty Report as set forth in paragraph 5.3 above.

## INDEMNIFICATION AND HOLD HARMLESS

**6.1    Owner Assumes No Liabilities.**

Owner is not assuming and shall not be responsible for any debts, obligations and/or liabilities of Distributor toward any third party arising in connection with Distributor's performance of its obligations under this Agreement or arising from Distributor's sale or promotion of the Product; Distributor assumes full responsibility for all such obligations.

**6.2    Owner to Indemnify Licensor for Patent Infringement Claims.**

Owner agrees to indemnify, defend and hold harmless Distributor, its officers, directors, employees, affiliates, agents, representatives, successors, assigns, customers and suppliers from and against any and all costs (including legal costs), expenses and claims, disputes, lawsuits, losses, damages or other liability arising from or in any way related to claims of patent infringement which may arise from Distributor's purchase, distribution, marketing or sale of the Product.

## OWNERSHIP OF PATENT

**7.1    Patent to be Assigned to
       Distributor to Be Held During Term of Agreement**

In order to provide Distributor with control over the Patent during the term of this Agreement, Owner shall assign to Distributor the Patent, which assignment shall be registered with the United States Patent and Trademark Office.  Distributor shall bear all costs and expenses associated with recording the assignment of the Patent.

**7.2    Transfer of Patent Back to Licensor**

The Patent shall remain in the name of Distributor during the term of this Agreement until such time, if ever, that Owner shall terminate this Agreement as provided under Section 4 above.  In the event this Agreement is terminated, Distributor shall at the request of Owner assign all rights to the Patent back to Owner, and Owner shall bear all costs and expenses in connection with recording such assignment.

**7.3    Execution of Assignments**

Owner shall execute the assignment of the Patent on the form annexed as Exhibit B.

## GOVERNING LAWS AND JURISDICTION

**8.1    New York Law Shall Apply**

Interpretation and enforcement of this Agreement shall be construed and governed by the laws of the State of New York, without regard to choice of law principles.

**8.2    Jurisdiction**

Any dispute which may arise under this Agreement or concerning any business dispute between the parties to this Agreement, shall be resolved by the State or Federal Courts located in the State of New York, Westchester County.  The parties agree to submit to the jurisdiction of all such courts for the purpose of resolving any such dispute(s).  The judgment of such court(s) shall be granted full faith and credit by the courts of all such other countries where the parties may be located at the time such judgment is entered.

## OWNER'S REPRESENTATIONS AND WARRANTIES

The Owner hereby represents, covenants and warrants to Distributor as follows:

**9.1    Organization; Standing**.  Owner is a corporation duly organized, validly existing and in good standing under the laws of Wisconson.

**9.2    Authority, Etc.**    Owner has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and this Agreement constitutes the legal, valid and binding agreement of Owner, enforceable in accordance with its terms except that (i) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefore may be brought.

**9.3**   **Consents**.  There are no notifications, filings, registrations, authorizations, permissions, permits, consents, licenses or requirements necessary to be obtained by Owner for the consummation of the transactions contemplated by this Agreement, including without limitation, consents from governmental agencies, whether federal, state or local.

## MISCELLANEOUS PROVISIONS

**10.1**   **Notices**.  Any notice or other communication to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if (i) personally delivered with proof of delivery thereof or sent by telefax (confirmed thereafter by regular United States mail sent within 24 hours) (any notice or communications so delivered being deemed to have been received at the time delivered), or (ii) sent by United States registered or certified mail, postage prepaid (any notice or communication so sent being deemed to have been received three (3) business days after mailing in the United States); (iii) by a nationally recognized overnight courier service (any notice or communications so sent being deemed to have been received at the time delivered); or (iv) by e-mail and confirmed thereafter by regular United States mail sent within 24 hours (any notice or communications so delivered being deemed to have been received at the time delivered) ; in each case addressed to the respective parties as follows:

    (a)     If to the Owner, to:     Versatile Housewares and Gardening Systems, Inc.
                                      100 Dahlen Circle,
                                      Cambridge, Wisconsin 53105 KD
                                      Attn:         Tom Mostosko
                                      E-Mail:       versatilehswe@smallbytes.net

or to such other person(s) or address(es) as the Owner shall furnish to Distributor in writing.

    (b)     If to Distributor, to:   SAS Group, Inc.
                                      200 White Plains Road
                                      Tarrytown, New York 10591
                                      Attn:   Scott Sobo
                                      E-Mail: scott.sobo@sasgroup.com

            (with a copy to:)         Kevin J. Harrington, Esq.
                                      Harrington, Ocko & Monk, LLP
                                      81 Main Street, Suite. 215
                                      White Plains, NY  10601
                                      E-Mail: kharrington@homlegal.com

or to such other person(s) or address(es) as Distributor shall furnish to the Owner in writing.

**10.2**   **Assignment**.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties, except that Distributor may assign this Agreement to any entity in which Scott Sobo and/or Michael Sobo has an ownership interest.

**10.3   Confidentiality.**   All parties hereto agree to keep the terms of this Agreement confidential and to not disclose any information contained herein except to the extent that such information is necessary to the consummation of the transactions contemplated herein.

**10.4   Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.5   Headings.** The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

**10.6   Entire Agreement.** This Agreement, including the Exhibits and Schedules hereto, and other documents and certificates delivered pursuant to the terms hereof, set forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersede all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any employee or representative of any party hereto.  Any modification of this Agreement must be in writing, signed by both of the parties to this Agreement and expressly stating that it is the intent of both such parties by such writing to modify the terms of this Agreement.

**10.7   Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**10.8.   Facsimile Execution.**   This Agreement may be executed and delivered by electronic or facsimile (including scanning) transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another and signatures on a facsimile or electronic copy hereof shall be deemed authorized original signatures.

IN WITNESS WHEREOF, the parties hereto have caused this Worldwide Distribution and Royalty Agreement to be duly executed all as of the day and year first above written.

*Distributor*                                                       *Owner*

*SAS GROUP, INC.*                                            *VERSATILE HOUSEWARES AND GARDENING SYSTEMS, INC*

By: _____                      By: _____
Scott Sobo,                                                          Tom Montosko
President                                                               President

# PATENT ASSIGNMENT AGREEMENT

**THIS AGREEMENT** is made this 19th day of December, 2006, by and between **Thomas P. Montosko** ("Inventor"), whose business address is 100 Dahlen Circle, Cambridge, Wisconson; **Versatile Housewares and Gardening Systems, Inc.** ("Assignor"), whose business address is 100 Dahlen Circle, Cambridge, Wisconson;  and **SAS Group, Inc.** ("Assignee"), whose business address is whose business address is 200 White Plains Road, Tarrytown, New York 10591. (collectively, the "Parties")

WHEREAS, Inventor or has invented  an auger for mixing and burrowing (the "Invention"), and has been granted United States Letters Patent for said invention, Patent No. 6,955,227 (the "Patent"), granted on the patent application filed with the United States Patent and Trademark Office, Patent Application Number 10/251,731 (the "Patent Application").

WHEREAS, Inventor has prior to the date hereof, assigned all right title and interest in the Patent to Versatile Housewares and Gardening Systems, Inc. ("Assignor"), whose business address is 100 Dahlen Circle, Cambridge, Wisconson.

WHEREAS, Inventor owns a controlling interest in Assignor.

WHEREAS, Assignee wishes to acquire all right, title and interest in the Patent, and Inventor and Assignor wish to convey and transfer their interest(s) in the Patent to Assignee.

NOW THEREFORE, in consideration of the mutual promises, covenants, warranties, and other good and valuable consideration set forth herein, the Parties agree as follows:

1.  Assignment.  Inventor and Assignor hereby assign to Assignee, and its successors, representatives and assigns, all of their respective rights, title and interest in and to the Patent including all reexaminations, extensions and reissues thereof, the same to be held and enjoyed by the said Assignee for its own use and for the use of its legal successors and assigns, to the full end of the term for which the Patent has been granted, as fully and entirely as the same would have been held by Inventor or Assignor had this assignment not been made.  Inventor and Assignor hereby request the Commissioner of Patents of the United States to record this assignment of all right, title and interest in the Patent to Assignee.

2.  Consideration.  In consideration of the assignment of the Patent pursuant to this Agreement, and of the promises and covenants contained herein, Assignee shall pay to Assignor monetary consideration as provided in a certain Worldwide Distribution and Royalty Agreement dated December 19, 2006 between Assignee and Assignor, a company in which Inventor holds a controlling ownership interest.

3. Inventor's and Assignor's Representations and Warranties.  Inventor and Assignor each hereby represent and warrant that they have the legal right and authority to execute this Agreement, and to validly assign the entire interest in the Patent to Assignee.  Inventor represents that he has previously assigned his entire right, title and interest in the Patent to Assignor, a company in which Inventor holds a controlling ownership interest,  but to the extent, if any that Inventor retains any right, title or interest in the Patent notwithstanding such assignment, Inventor herein coveys all such right, title and interest in and to the Patent to Assignee. Inventor and Assignor further represent and warrant that neither of them has executed any other agreement that would conflict with the terms of this Agreement, nor shall either of them execute any such agreement in the future.

4. Further Actions.  Inventor and Assignor hereby agree to execute any further agreements and to take any further actions necessary to aid Assignee in perfecting its interest in the Patent and in enforcing any and all protections or privileges deriving from the Patent and to take any action which may need to be taken from time to time with the United States Patent and Trademark Office to continue to allow Assignee to enjoy all protections and privileges deriving from the Patent and to secure the continued enforceability and good standing of the Patent.

5. Governing Law.  This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of New York, without regard to conflicts of law principles. Any dispute concerning this assignment shall be resolved by courts located in the State of New York and the Parties consent to the jurisdiction of such courts for that purpose.

6. Counterparts.   This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

7. Severability.   If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

8. **Notice.**   Any notice required or otherwise given pursuant to this Agreement shall be in writing and mailed certified return receipt requested, postage prepaid, or delivered by overnight delivery service, addressed as follows:

If to Assignor:    Versatile Housewares and Gardening Systems, Inc.
100 Dahlen Circle,
Cambridge, Wisconson
Attn:        Tom Mostosko

If to Assignee:    SAS Group, Inc.
200 White Plains Road
Tarrytown, New York 10591
Attn:  Scott Sobo

(with a copy to:)  Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite. 215
White Plains, NY  10601

9. **Headings.**   The headings for section herein are for convenience only and shall not affect the meaning of the provisions of this Agreement.

10. **Entire Agreement.**   This Agreement constitutes the entire agreement between Assignor and Assignee documenting the assignment of this Patent, and this Agreement, taken together with the Worldwide Distribution and Royalty Agreement between the Parties dated December 19, 2006, supersedes any prior understanding or representation of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement other than the Worldwide Distribution and Royalty Agreement dated December 19, 2006, which incorporates this Patent Assignment Agreement by reference.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.

**INVENTOR**
**Thomas P. Montosko**

Signature
Name:   Thomas P. Montosko

**ASSIGNOR**
**Versatile Housewares and Gardening Systems, Inc.**

Signature
By:   Thomas P. Montosko, President

**ASSIGNEE**
**SAS Group, Inc.**

Signature
By:   Scott Sobo, Vice President

State of Wisconsin                )
                                  )
County of  DANE                   ) ss

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT   **Thomas P. Montosko**,  personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he signed, sealed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal, this _____22_____ day of _December_, 20_06_.

_Susan A. Christianson_
Signature of Notary Public

(Seal)
_Susan A. Christianson_
Printed Name of Notary

My commission expires on _October 14_____, 20_07_.

State of Wisconsin                    )
                                      )
County of _Dane_____ ) ss

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT **Thomas P. Montosko, as President of Versatile Housewares and Gardening Systems, Inc.,** personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he signed, sealed and delivered the said instrument as his/her/their free and voluntary act, with the full authority of the Board of Directors of said company for the uses and purposes therein set forth.

Given under my hand and notarial seal, this ____22____ day of December, 2006.

*Susan A. Christianson*
Signature of Notary Public

(Seal)
*Susan A. Christianson*
Printed Name of Notary

My commission expires on ___October 14_____, 20_07_.

State of  New York                              )
                                                )
County of Westchester                          ) ss

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT **Scott Sobo, as Vice President of SAS Group, Inc.** personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he signed, sealed and delivered the said instrument as his/her/their free and voluntary act, with the full authority of the Board of Directors of said company, for the uses and purposes therein set forth.

Given under my hand and notarial seal, this ___27 TH___ day of December, 2006.

*Jacqueline Knapp*
Signature of Notary Public

JACQUELINE KNAPP
NOTARY PUBLIC, State of New York
No. 01KN5018441
Qualified in Westchester County
Commission Expires September 27, 2009

(Seal)
*Jacqueline Knapp*
Printed Name of Notary

My commission expires on ___September 27___, 20_09_.

*Patent Assignment Agreement*                                               6

Tom Motosko

**From:** "Scott Sobo" <scott.sobo@sasgroup.com>
**To:** "Tom Motosko" <versatilehswe@smallbytes.net>
**Sent:** Monday, December 04, 2006 8:51 AM
**Subject:** RE: Ground Aug Marketing Agreement - SAS Group and Versatile Housewares (Tom Motosko)

Tom:

Please see my notes below.

---

**From:** Tom Motosko [mailto:versatilehswe@smallbytes.net]
**Sent:** Saturday, December 02, 2006 4:47 PM
**To:** Scott Sobo
**Subject:** Fw: Ground Aug Marketing Agreement - SAS Group and Versatile Housewares (Tom Motosko)

Scott,

Here is what was sent to Kevin Harrington. I hope a fair and equally acceptable agreement can be
worked out between the attorneys so we can get to work soon.
I have put the factory on notice of a large order and I also have a second factory that I have had
manufacture the Auger as a backup for production if needed.
Have a good weekend and I hope you are not as cold as we are in Wisconsin.

Tom Motosko
----- Original Message -----
**From:** Shull, Joe A.
**To:** Tom Motosko (Versatile Housewares)
**Sent:** Thursday, November 30, 2006 4:04 PM
**Subject:** Ground Aug Marketing Agreement - SAS Group and Versatile Housewares (Tom Motosko)

Dear Tom,

This is what I just sent to Kevin Harrington.

**Joe A. Shull**
Venable LLP
575 7th Street, N.W., Washington, D.C.  20004-1601
Tel: 202-344-4821;   Fax: 202-344-8300
www.venable.com;  Email: jashull@venable.com

-----Original Message-----
**From:** Shull, Joe A.
**Sent:** Thursday, November 30, 2006 5:03 PM
**To:** Kevin Harrington (Counsel to SAS Group)
**Subject:** Ground Aug Marketing Agreement - SAS Group and Versatile Housewares (Tom Motosko)

November 30, 2006

Dear Kevin:

We are representing Versatile Housewares and Gardening Systems Inc. with respect to the
proposed distribution agreement for the auger invention. Here are our observations, and
Versatile's points for discussion, with respect to the proposed agreement:

1.   **License v. Assignment**.  Versatile should be licensing, rather than assigning, the patent to
SAS.  That way, if SAS fails to honor the agreement, such as failing to pay the royalty, then
Versatile has not only a breach of contract claim against SAS but also an infringement claim if
SAS continues to sell the product following termination of the agreement.  Another reason would
be that if SAS has an assignment, the patent would be subject to the claims of SAS' creditors and
could be seized by the creditors of SAS should SAS become behind in its obligations.*[Scott
Sobo]* It is for this exact reason we take assignment.  With all due respect, I think that SAS is a
larger company with greater resources.

2.   **Timetable for Production of an Infomercial**.  SAS should commit to producing a long
form infomercial and test marketing it in the U.S. by the end of January, 2007.*[Scott Sobo]* I
have no problem with setting a time table for production.  We will shoot a short form two-minute
spot, not an infomercial.  We will commit to finish production 90 days after the execution of the
agreement.

3.   **Minimum Royalties**.  SAS' rights should be dependent on its making certain minimum
royalty payments to Versatile, on a periodic basis, I would say with the first one due by June 30,
2007, and the others to follow each six months thereafter.  What minimums would Versatile
propose? The understanding would be that SAS has no obligation to make the payments, but if it
fails to do so, Versatile would have the right to terminate the license.*[Scott Sobo]* We pay
royalties on a quarterly basis.

4.   **Advance on Rollout**.  If the test proves successful, to secure its exclusivity through June 30,
2007, SAS should make a non-refundable advance (after the test) to Versatile of the minimum
royalty target that otherwise must be met by June 30, 2007. If SAS chooses not to make the
advance (presumably because the test was not successful) the license terminates.*[Scott Sobo]*
We would not agree to this.

5.   **Trademark Rights**.  Versatile would make no representations regarding the
trademarks (Ground Aug, Weed Aug, and Awesome Aug) it presently uses with the
product.  There are no federal registrations.  However, if SAS uses those marks or develops new
marks, on termination of the agreement the marks used by SAS, and all rights that SAS may
have obtained as a result of such usage, should be assigned to Versatile.*[Scott Sobo]* we will use
our own name and register that mark.

6.   **Patent Rights**.  Versatile will license its U.S. patent #6,955,227 (issued October 18, 2005)
to SAS, but Versatile cannot make any representations, warranties, or indemnities with respect
thereto other than that Versatile owns the patent and that Versatile has not received any notices



EXHIBIT
B
tabbies

8/26/2009

fro⁺ , third parties claiming that the augers Versatile is currently selling are violating any other parties' patents or that the Versatile patent is invalid.*[Scott Sobo]*

7.   **Versatile's Own Sales of the Product**.   Versatile should be allowed to continue to sell the product through its existing channels, at least until SAS' sales reach a certain agreed level.   Those channels are a few catalogs and the pitch market (fairs, shows, etc., where a personal demonstration of the product is made).   Also, Versatile should be allowed to continue to sell the components that SAS chooses not to include in SAS' product line-up.*[Scott Sobo]* you will need to stop upon us confirming that we are going into rollout.

8.   **Quality Approval**.   Versatile should have some say in the quality of the product to be sold under its license.*[Scott Sobo]* As long as "approval" is within seven (7) business days. After that it is assumed that product has been approved.

9.   **Products Liability Insurance**.   SAS should maintain products liability insurance in an agreed amount, naming Versatile and Tom Motosko as additional insureds on a primary basis. In this connection, SAS should agree to indemnify and hold Versatile and Mr. Motosko harmless with respect to any claims from third parties arising out of SAS' manufacturing, marketing, and distribution activities.*[Scott Sobo]* Not if 8 is in the agreement.

10.   **Royalty on Sales**.   What royalty percentage do you propose?   The royalty should be paid on all items that are included in the infomercial, and on all upsells and sales of collateral items.   It should also be paid monthly, instead of quarterly.   The product should not be offered as a freebie with another product.*[Scott Sobo]* 3% on TV and 5% of net retail.

11.   **Ownership of Improvements**.   If SAS comes up with an improvement to the invention, the improvement should be owned by Versatile.*[Scott Sobo]* I'll discuss this with my attorney.

12.   **Resolution of Disputes**.   Disputes should be resolved by arbitration, before JAMS or the AAA (take your pick), in Cambridge, Wisconsin if brought by SAS and in Tarrytown, New York if brought by Versatile.*[Scott Sobo]* we will not agree to this.

I can assist with preparing a form of agreement, if you like, once we work out understandings with respect to the above points.

Joe A. Shull
Venable LLP
575 7th Street, N.W., Washington, D.C.  20004-1601
Tel: 202-344-4821;   Fax: 202-344-8300
www.venable.com;   Email: jashull@venable.com

*************************************************************
U.S. Treasury Circular 230 Notice: Any tax advice contained in this communication (including any attachments) was not intended or written to be used,
*************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please n
*************************************************************

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.15.2/559 - Release Date: 11/30/2006 5:07 AM

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.15.6/567 - Release Date: 12/4/2006 7:18 AM

**From:** Gene Sobo
**To:** Tom Motosko
**Sent:** Thursday, July 19, 2007 7:49 AM
**Subject:** RE: Awesome Auger

Tommy,

I'm not certain what you're saying here in response to my query about the web site below is the "listed" contact information.  They have no right to the domain name since you own the trademark.  A simple legal letter will probably get them to relinquish it.

Who is Sandstrom?

Regards.

Gene Sobo
SAS Group, Inc.
220 White Plains Rd.
Tarrytown, New York 10591 USA
Direct phone:  914.333.7406
General phone:  914.332.7878
Facsimile:  914.332.7859

**From:** Tom Motosko [mailto:versatilehswe@smallbytes.net]
**Sent:** Wednesday, July 18, 2007 5:01 PM
**To:** Gene Sobo
**Subject:** Awesome Auger

Gene,

Happy to hear things are taking off here.  Canada and the UK is bigger than the US.  We will ROCK there.
The domain name Awesome Auger is taken but it is not up and it was not available when I tried to get it.  If it is up I can't find it on the internet.  I licensed the patent and trademarks to you for 17 more months so Ground Aug and Awesome Auger is yours for now.  Actually my new adjustable auger was to be called the Awesome Auger since my company currently selling this model as the Ground Aug.  I will start selling my new model which has a seperate patent application as the Ultimate Auger.
I have no idea who owns the domain name Awesome Auger. I googled and on ask.com nothing really shows up.

Good to hear from you.  Has Tony shown you my jerky maker?

I will be working late to try catching up call if I can help.
I see Billy Mays is now vice president of Sandstrom is he still going to do work for us?  I have not talked to him or Tony yet.
Say hello to your brothers.

Best regards

Tom Motosko
Versatile Housewares &
Gardening Systems Inc.
100 Dahlen cr.


EXHIBIT
C

Cambridge, WI 53523
Tel/Fax: 608-423-3358
Direct: 608-423-4933



UNITED STATES OF AMERICA

The State Wisconsin

### OFFICE OF THE SECRETARY OF STATE

## To all to whom these presents shall come, Greetings!

I, **DOUGLAS LA FOLLETTE**, Secretary of State of the State of Wisconsin, do hereby certify that, pursuant to Chapter 132 of the Statutes,

### THOMAS P MOTOSKO

has filed for record in this department, a statement of adoption of a mark, to wit:

THE AWESOME AUGER

This application is valid for a period of ten years from the date hereon, unless revoked sooner for cause.



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my offical seal, in the City of Madison, on August 6, 2003.

*Douglas La Follette*

**DOUGLAS LA FOLLETTE**
Secretary of State



EXHIBIT

D

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America



**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

TX 6-411-738

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

5   22   06.
Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## A

Title of Work ▼
**Ground Aug Instructions**

Registration Number of the Basic Registration ▼
**TX-5-805-973**

Year of Basic Registration ▼
2003

Name(s) of Author(s) ▼
Thomas P. Motasko
Jana Healy

Name(s) of Copyright Claimant(s) ▼
**Thomas P. Motasko**

## B

Location and Nature of Incorrect Information in Basic Registration ▼

Line Number **2**          Line Heading or Description **Name of Author**

Incorrect Information as It Appears in Basic Registration ▼

Thomas P. Motasko

Corrected Information ▼

Thomas P. Motosko

Explanation of Correction ▼

Name was misspelled

## C

Location and Nature of Information in Basic Registration to be Amplified ▼

Line Number _____    Line Heading or Description _____

Amplified Information and Explanation of Information ▼



**EXHIBIT**

E

---

| FORM CA RECEIVED | FORM CA |
|---|---|
| MAY 22 2006 | |
| FUNDS RECEIVED DATE | |

EXAMINED BY

CORRESPONDENCE ☐

REFERENCE TO THIS REGISTRATION ADDED TO
BASIC REGISTRATION   ☐ YES ☐ NO

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

Continuation of ☑ Part B *or* ☐ Part C

**D**

Line 4: Heading: Copyright Claimant

Incorrect Info:  Mr. Thomas P. Motasko
          100 Dahlen Circle
          Cambridge, WI  53523

Explanation: Misspelling

Correct Info:  Mr. Thomas P. Motosko
          100 Dahlen Circle
          Cambridge, WI  53523

Line 1:  Heading:  Title of Work          Explanation: Mistake made by Copyright Office,
      Incorrect Info: Ground aug.              correction requested on 5/15/2006 to
      Correct Info: Ground Aug Instructions         Copyright Service Specialist

**E**

Correspondence: Give name and address to which correspondence about this application should be sent.

Michael J. Gratz, Boyle, Fredrickson, Newholm, Stein & Gratz, S.C.
100 East Wisconsin Avenue, Suite 1030, Milwaukee, WI 53202

Phone ( 414 ) 225-9755      Fax ( 414 )  225-9753      Email mjg@boylefred.com

Deposit Account: If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name _____

Account Number _____

**F**

Certification* I, the undersigned, hereby certify that I am the: (Check only one)
  ☐ author          ☐ owner of exclusive right(s)   Thomas P. Motosko
  ☐ other copyright claimant  ☑ duly authorized agent of   _____
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼ Michael J. Gratz          Date ▼ 5/16/06

Handwritten signature (X) ▼

**G**

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
Michael J. Gratz, S.C.,  Boyle, Fredrickson, Newholm, Stein & Gratz

Number/Street/Apt ▼
250 East Wisconsin Avenue, Suite 1030

City/State/ZIP ▼
Milwaukee, WI  53202

YOU MUST:
• Complete all necessary spaces
• Sign your application in Space F

SEND ALL ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or
   money order payable to *Register of
   Copyrights*
MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

Fees are subject to
change. For current
fees, check the
Copyright Office
website at
www.copyright.gov,
write the Copyright
Office, or call
(202) 707-3000.

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection
with the application, shall be fined not more than $2,500.

Rev. July 2002—20,000   Web Rev. July 2002   Printed on recycled paper          U.S. Government Printing Office: 2002-491-423/60,009